AUSAs: Benjamin A. Gianforti, Jackie Delligatti

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | **24 MAG 1724** |
| UNITED STATES OF AMERICA<br><br>v.<br><br>EMMANUEL TORRES and<br>JAROL FABIO,<br><br>                    Defendants. | **SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 1960 and 2,<br>49 U.S.C. §§ 46314(a) and (b)(2).<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

CHRISTOPHER FANT, being duly sworn, deposes and says that he is a Special Agent with the Homeland Security Investigations ("HSI"), and charges as follows:

### COUNT ONE
**(Operation of an Unlicensed Money Transmission Business)**

1. From at least in or about 2015 through at least in or about June 2022, in the Southern District of New York and elsewhere, EMMANUEL TORRES, the defendant, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business, which affected interstate and foreign commerce and (i) was operated without an appropriate money transmitting license in a State where such operation was punishable as a misdemeanor or a felony under State law; and (ii) failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, to wit, TORRES conducted, controlled, managed, supervised, directed, and owned all or part of an unlicensed money transmission business that transferred funds on behalf of the public, without meeting the Federal or State registration requirements set forth for money transmitting businesses, by smuggling bulk currency from New York City to the Dominican Republic in exchange for a fee.

(Title 18, United States Code, Sections 1960 & 2.)

### COUNT TWO
**(Operation of an Unlicensed Money Transmission Business)**

2. From at least in or about 2015 through in or about May 2023, in the Southern District of New York and elsewhere, JAROL FABIO, the defendant, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business, which affected interstate and foreign commerce and (i) was operated without an appropriate money transmitting license in a State where such operation was punishable as a misdemeanor or a felony under State law; and (ii) failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, to wit, FABIO conducted, controlled, managed,

supervised, directed, and owned all or part of an unlicensed money transmission business that transferred funds on behalf of the public without meeting the Federal or State registration requirements set forth for money transmitting businesses by smuggling bulk currency from New York City to the Dominican Republic in exchange for a fee.

(Title 18, United States Code, Sections 1960 & 2.)

## COUNT THREE
### Entering an Airport or Aircraft Area in Violation of Security Requirements

3. From at least in or about April 2022 through at least in or about June 2022, in the Southern District of New York and elsewhere, EMMANUEL TORRES, the defendant, did knowingly and willfully enter an aircraft or an airport area that serviced an air carrier or foreign air carrier, in violation of security requirements proscribed under Title 49, United States Code, Section 44901, 44903(b) and (c), with the intent to evade security procedures and restrictions and with the intent to commit, in the aircraft and airport area, a felony under the law of the United States and a State, namely, operation of an unlicensed money transmission business, in violation of Title 18, United States Code, Section 1960, to wit, TORRES entered the secure passenger area at John F. Kennedy International Airport ("JFK") with the intent to evade security procedures and restrictions in order to smuggle bulk currency with the intent to operate an unlicensed money transmission business, in violation of 18 U.S.C. § 1960.

(Title 49, United States Code, Sections 46314(a) and (b)(2).)

## COUNT FOUR
### Entering an Airport or Aircraft Area in Violation of Security Requirements

4. At least in or about May 2023, in the Southern District of New York and elsewhere, JAROL FABIO, the defendant, and others known and unknown, did knowingly and willfully enter an aircraft or an airport area that serviced an air carrier or foreign air carrier, in violation of security requirements proscribed under Title 49, United States Code, Section 44901, 44903(b) and (c), with the intent to evade security procedures and restrictions and with the intent to commit, in the aircraft and airport area, a felony under the law of the United States and a State, namely, operation of an unlicensed money transmission business, in violation of Title 18, United States Code, Section 1960, to wit, FABIO entered the secure passenger area at JFK with the intent to evade security procedures and restrictions in order to smuggle bulk currency with the intent to operate an unlicensed money transmission business, in violation of 18 U.S.C. § 1960.

(Title 49, United States Code, Sections 46314(a) and (b)(2).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5. I have been a Special Agent with HSI for approximately six years. During that time, I have participated in numerous investigations of unlawful narcotics distribution and associated money laundering, as well as bulk cash smuggling in violation of Title 31, United States Code, Section 5332. During the course of those investigations, I have conducted or participated in surveillance, narcotics and money transactions with undercover officers and confidential

witnesses, the execution of search warrants, debriefings of witnesses, and reviews of taped conversations and other records relating to narcotics transactions. Through my training, education, and experience, I have become familiar with the manner in which illegal narcotics are imported and distributed; the way in which illegal narcotics are prepared, packaged, and sold on the street; some of the methods of payment for such narcotics; and some of the methods that are used to disguise the source and nature of the profits made by narcotics dealers.

6. I make this Affidavit in part on personal knowledge based on my participation in the investigation and conversations with other HSI Special Agents and Task Force Officers, and other law enforcement officers; conversations with two cooperating witnesses ("CW-1" and "CW-2")[1]; reviews of reports and other documents prepared by agents and others; and physical surveillance.

7. Throughout this Affidavit, where I assert that a statement was made, I was not the individual to whom the statement was made unless I specifically so state. Rather, information about the statement was provided by the specified law-enforcement officer or another individual to whom I have spoken or whose reports I have read and reviewed. In addition, unless otherwise noted, the conversations from which the statements referenced herein were sourced were conducted principally in Spanish and later translated into English. All statements referenced herein are among many statements made by others and they are set forth in substance and in part, unless otherwise indicated. Similarly, the information in this Affidavit resulting from surveillance, except where otherwise specifically indicated, does not set forth my personal observations, but rather was provided to me by other law-enforcement officers who observed the events described, and/or to whom I have spoken or whose reports I have read.

8. Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of this Application. I have not attempted to set forth the complete factual history of this investigation or all of its details. In making this Application, I rely only on the facts stated herein.

---

[1] CW-1 has been cooperating with law enforcement since CW-1's arrest in or about October 2021 on money laundering, bulk cash smuggling, and narcotics distribution charges, in the hopes of ultimately receiving leniency when CW-1 is sentenced for CW-1's crimes. The information CW-1 has provided to law enforcement has proven credible and has been corroborated by other evidence, including, among other things, CW-1 and CW-2's communications with the defendants and recordings CW-1 and CW-2 have made of meetings with the defendants.

CW-2 has been cooperating with law enforcement since being charged with money laundering, bulk cash smuggling, and narcotics distribution charges along with CW-1 in or about October 2021. Because CW-2 resides in the Dominican Republic, and was there at the time CW-1 and CW-2 were charged, CW-2 has not been arrested on these charges. Nonetheless, CW-2 is cooperating with law enforcement in the hopes of receiving leniency when CW-2 is ultimately sentenced for CW-2's crimes. The information CW-2 has provided to law enforcement has proven credible and has been corroborated by other evidence, including, among other things, CW-1 and CW-2's communications with the defendants and recordings CW-1 and CW-2 have made of meetings with the defendants.

**Background to the Investigation**

9.      Since approximately December 2018, HSI and the New York City Police Department ("NYPD") have been investigating an international narcotics trafficking and money laundering organization involved in, among other things, trafficking fentanyl in the United States and moving the proceeds of narcotics trafficking from the United States to the Dominican Republic, including by using flight attendants at major airlines to smuggle bulk quantities of cash. Law enforcement officers have been conducting this investigation with the assistance of CW-1 and CW-2. CW-1 was a member of this money laundering organization and has used a number of different flight attendants to smuggle bulk cash to the Dominican Republic, including EMMANUEL TORRES and JAROL FABIO, the defendants. CW-2 was also a member of this money laundering organization and has assisted CW-1 with the transport of bulk cash from the United States to the Dominican Republic.

*Background on the Known Crewmember (KCM) Program*

10.     From my training and experience, including my participation in this investigation and my discussions with other law enforcement officers, I have learned, among other things, that international narcotics traffickers who traffick narcotics in the United States often accumulate significant cash proceeds that need to be moved outside of the United States. In particular, I have learned that narcotics traffickers who operate from the Dominican Republic often prefer to receive the proceeds from their illegal activity in the United States in cash, rather than relying on banking services. This requires the smuggling of large quantities of cash from the United States to the Dominican Republic. One common tactic for smuggling cash to the Dominican Republic involves paying flight attendants who work routes between U.S. cities and the Dominican Republic to move large quantities of cash. I have learned the following about this scheme:

    a.      Flight attendants are ideal for smuggling bulk cash because they generally have "Known Crewmember" ("KCM") status with the Transportation Security Administration ("TSA"), which allows airline employees to pass through airport security more quickly via a dedicated KCM lane that typically entails less scrutiny. JFK, from which all the flights relevant to this complaint were taken, has a KCM lane.

    b.      Unlike the security screening process for ordinary passengers, which requires that passengers place their belongings through an x-ray machine, the KCM lane does not automatically require airline employees to place their belongings through an x-ray machine. Once an individual goes through security—whether the ordinary security screen process or the KCM lane—that individual enters the "sterile" area, from which it is possible to access airplanes and other secure areas of the airport.

    c.      KCM privileges are available to airline employees such as flight attendants whose airline participates in the KCM program. Airline employees must present valid identification each time they wish to use the KCM lane. Individuals with KCM privileges are permitted to bring personal property through the KCM lane so long as the property is not on TSA's prohibited items list. This applies to personal property. Those with KCM privileges may not bring property belonging to other individuals through the KCM lane.

    d. Individuals who gain KCM privileges through their employing airline may use the KCM lane only for (1) business travel related to their employing airline, and (2) domestic personal travel. Such individuals are not required to wear their crewmember uniform to use the KCM lane. However, those who are in uniform receive certain privileges not afforded to those who are not in uniform.

    e. If an airline employee attempts to use the KCM lane and the TSA employee monitoring the KCM lane has any concerns about that employee's security status, he or she may take follow-up steps, including referring the airline employee to the ordinary screening process.

    f. In effect, given these loosened security procedures, KCM privileges allow flight attendants to bypass airport security with large quantities of cash without that cash being seized.

*Background on the Registration of Money Transmitting Businesses*

  11. From my training and experience, including my participation in this investigation and my discussions with other law enforcement officers, I have learned, among other things, the following:

    a. New York law requires anyone operating a money transmitting business to be licensed. In particular New York State Banking Law Section 641(1) provides in pertinent part that "[n]o person shall…engage in the business of receiving money for transmission or transmitting the same, without a license therefor obtained from the superintendent as provided in this article, nor shall any person engage in such business as an agent, except as an agent of a licensee or as agent of a payee."

    b. Under federal law, money transmitting businesses must also be registered with the U.S. Department of Treasury. For instance, Title 31, United States Code, Section 5330(a)(1) provides that "[a]ny person who owns or controls a money transmitting business shall register (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury." Section 5330(d)(1), in turn, explains, in part, that the "term 'money transmitting business' means…(A) any…person who engages as a business in the transmission of currency, funds, or other value that substitutes for currency, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system; (B) is required to file reports under section 5313; and (C) is not a depository institution (as defined in section 5313(g))."[2]

---

[2] The Secretary of the Treasury has the authority to establish which individuals and entities are subject to 31 U.S.C. 5330's registration requirement. 31 U.S.C. §§ 5313(a); 5330(a)(2) & (c)(1). These regulations are contained in the Code of Federal Regulations ("CFR"). In particular, 31 C.F.R. § 1022.380(a)(1) provides that "each money services business (whether or not licensed as a money services business by any State) must register with FinCEN …as required by 31 U.S.C. 5330[.]" 31 C.F.R. § 1010.100(ff) includes a "money transmitter" as a "money services business." The term "money transmitter" is, in turn, defined to include "a person that provides money transmission services." The term "money transmission services" is defined as "the acceptance of

c.      The New York and federal requirements for money transmitting businesses apply to formal and informal arrangements alike.

12.     Based on my review of records from New York State and FinCEN, I know that neither EMMANUEL TORRES, nor JAROL FABIO, has ever held a New York State or federal money transmission license.

### TORRES's Participation in the Smuggling of Narcotics Proceeds

13.     Based on my discussions with other law enforcement officers participating in this investigation and CW-1 and CW-2, my review of reports drafted by other members of law enforcement, recordings, and other records, I have learned the following:

a.      From at least in or about 2015 to in or about June 2022, EMMANUEL TORRES, the defendant, was employed as a flight attendant, including with a certain international airline (the "International Airline").

b.      In or about late 2015, CW-1 began using TORRES to smuggle narcotics proceeds from New York City to the Dominican Republic. CW-1 estimates that TORRES smuggled at least approximately $1,500,000 in narcotics proceeds, or cash he understood to be narcotics proceeds, from the United States to the Dominican Republic at CW-1's direction between in or about 2015 and in or about 2022 in exchange for a fee—generally, a low percentage of the amount of cash TORRES smuggled on CW-1's behalf.

c.      On or about April 28, 2022, TORRES sent CW-1 a text message to let CW-1 know that TORRES was scheduled to work an International Airline flight from JFK to the Dominican Republic on or about May 30, 2022. On or about May 28, 2022, TORRES sent CW-1 another text message to remind CW-1 of TORRES's upcoming flight to the Dominican Republic. In this text message, TORRES asked CW-1, in substance and in part, if CW-1 had any "lotions" to send to the Dominican Republic. Based on my discussions with CW-1, as well as my training and experience, I understand "lotions" to be code for narcotics proceeds. At the direction of law enforcement, CW-1 responded to TORRES and apologized for not having any money to give to TORRES to bring to the Dominican Republic recently, explaining that the "streets…turn[] on and off." Based on my discussions with CW-1, as well as my training and experience, I understand CW-1's reference to "the streets" to be code for narcotics traffickers with cash proceeds in need of money laundering services.

---

currency, funds, or other value that substitutes for currency from one person *and* the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." *Id*. "Any means" is defined as including, but not limited to, "through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or an informal value transfer system." *Id.* Moreover, "money transmitter" is defined as "[a]ny other person engaged in the transfer of funds." *Id.* Accordingly, the Treasury regulations establish that any person engaged in the transfer of funds is required to register with FinCEN.

    d. On or about June 12, 2022, at the direction of law enforcement, CW-1 asked TORRES if he was scheduled to work any flights to the Dominican Republic on June 20 or 21, 2022. TORRES confirmed that he was scheduled to work a flight to the Dominican Republic on or about June 21, 2022. CW-1 responded that he would tell "los tigres" to begin collecting their cash so that CW-1 could hand it off to TORRES on or about June 20, 2022. Based on my discussions with CW-1, as well as my training and experience, I understand "los tigres" to be a Spanish slang term for narcotics dealers.

    e. On or about June 19, 2022, TORRES told CW-1 via text message that he could meet CW-1 to receive the cash in the morning on or about June 21, 2022, rather than on or about June 20, 2022.

    f. On or about June 21, 2022, at the direction of law enforcement, CW-1 arranged to meet with TORRES in Brooklyn to hand off approximately $60,000 in Government funds that CW-1 represented to be the proceeds of narcotics trafficking. The Government funds were withdrawn from a bank in Manhattan. During a phone conversation prior to the meeting, TORRES told CW-1 that he had driven that morning from New Jersey to Brooklyn and indicated that CW-1 had traversed the George Washington Bridge[3] as part of the trip. During the meeting in Brooklyn, CW-1 and TORRES discussed how the narcotics business had been slow recently and that that was why CW-1 had not had more cash for TORRES to bring to the Dominican Republic. CW-1 then provided TORRES with the approximately $60,000 in government funds. CW-1 explained that CW-1 had set aside approximately $2,100 from the $60,000 as TORRES's fee for transporting the cash. The meeting was audio recorded at the direction of law enforcement.

    g. On or about June 22, 2022, CW-1 contacted TORRES and told him that CW-2 would be contacting TORRES directly to arrange for the handoff of the cash in the Dominican Republic. Thereafter, CW-2 contacted TORRES and arranged to pick up the cash at a hotel in Santo Domingo, the capital of the Dominican Republic. On or about June 22, 2022, at approximately 11:00 a.m., TORRES met CW-2 in Santo Domingo and gave CW-2 the cash that was given to him by CW-1, which was then returned to law enforcement.

### **FABIO's Participation in the Smuggling of Narcotics Proceeds**

  14. Based on my discussions with other law enforcement officers participating in this investigation, CW-1 and CW-2, and my review of reports drafted by other members of law enforcement, recordings, and other records, I have learned the following:

    a. JAROL FABIO, the defendant, has worked as a flight attendant since at least in or about 2015, including for the International Airline. In or about 2015 CW-1 began using FABIO to smuggle narcotics proceeds from New York City to the Dominican Republic. CW-1 estimates that FABIO smuggled at least approximately $1,500,000 in narcotics proceeds, or cash he understood to be narcotics proceeds, from the United States to the Dominican Republic at CW-1's direction between in or about 2015 and in or about 2023 in exchange for a fee—generally, a low percentage of the amount of cash FABIO smuggled on CW-1's behalf.

---

[3] The George Washington Bridge connects New Jersey to Manhattan.

    b. In at least in or about May 2023, JAROL FABIO, the defendant, was employed as a flight attendant with the International Airline. On or about May 17, 2023, at the direction of law enforcement, FABIO and CW-1 exchanged text messages to arrange for FABIO to pick up approximately $60,000 in law enforcement funds represented to be the proceeds of narcotics trafficking. I believe that FABIO understood the proceeds to be from the trafficking of narcotics because during his conversation with CW-1 he acknowledged CW-1's contacts moving money, as opposed to "stuff," overseas. Based on my discussions with CW-1, as well as my training and experience, I understand "stuff" to be code for narcotics. Later that day, CW-1 met with FABIO in Manhattan and provided FABIO with approximately $60,000 in government funds. The meeting was audio recorded at law enforcement's direction.

    c. The next day, CW-1 and FABIO exchanged text messages about arranging for CW-2 to pick up the cash from FABIO in the Dominican Republic. On or about May 19, 2023, FABIO sent CW-1 a text message confirming that he had arrived in the Dominican Republic. Later that day, FABIO met with CW-2 in the Dominican Republic and gave CW-2 approximately $57,900, which represented the $60,000 given to FABIO by CW-1 minus FABIO's agreed-upon fee for transporting the cash. The $57,600 was later returned to law enforcement.

  WHEREFORE, I respectfully request that a warrant be issued for the arrest of EMMANUEL TORRES and JAROL FABIO, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

              /s Christopher Fant (By Court with Authorization)
              Christopher Fant
              Special Agent
              HSI

Sworn to me through the transmission of
this Complaint by reliable electronic
means (Telephone), this 30th day of April,
2024.

_____
THE HONORABLE SARAH L. CAVE United
States Magistrate Judge
Southern District of New York